1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHNNY ROBERT GARCIA,       )    No. C 06-6735 MMC (PR)
                            )
            Plaintiff,      )    **ORDER GRANTING  DEFENDANTS'**
                            )    **MOTION FOR SUMMARY JUDGMENT**
       v.                   )
                            )
G. STEWART, et al.,         )
                            )    **(Docket Nos. 35 & 37)**
            Defendants.     )
_____)

On October 30, 2006, plaintiff, a California prisoner proceeding pro se, filed the above-titled civil rights action under 42 U.S.C. § 1983, alleging the violation of his constitutional rights by prison officials at Pelican Bay State Prison ("PBSP").  Now pending before the Court is defendants' motion for summary judgment.  Plaintiff has filed opposition to the motion and defendants have filed a reply.

**FACTUAL BACKGROUND[1]**

The complaint concerns the decision by PBSP prison officials, first in November 2004 and again in September 2005, to continue plaintiff's status as an active gang member and retain him in the PBSP Security Housing Unit ("SHU") for an indeterminate term.  Specifically, plaintiff challenges both the constitutionality of the procedures prison officials used to make their determination and the determination itself.

_____

[1]Unless otherwise noted, the facts set forth in the following section are undisputed.

**United States District Court**
For the Northern District of California

A.    <u>Procedures for Placing and Retaining Gang Members on Indeterminate SHU Status</u>

The California Code of Regulations ("CCR") governs the procedures for identifying and validating prison gang members, placing and retaining gang members on indeterminate SHU status, and conducting periodic reviews of their gang status.  Under the regulations, a prison's Institutional Gang Investigator ("IGI") determines whether, and to what extent, prisoners are involved in prison gangs, <u>see</u> CCR § 3378(c), and the Institutional Classification Committee ("ICC") decides if an indefinite term in the SHU should be imposed based on the IGI's determination.  <u>Id.</u> §§ 3335, 3338.  Once a prisoner is validated as a prison gang member or associate, he is presumed to be "a severe threat to the safety of others or the security of the institution and will be placed in a SHU for an indeterminate term."  <u>Id.</u> § 3341.5(c)(2)(A)(2).

The ICC's decision to place a prisoner on indeterminate SHU status must be reviewed and approved by a Classification Staff Representative ("CSR").  <u>Id.</u> § 3335(d).  Further, in addition to the annual classification reviews that all prisoners receive, <u>see</u> <u>id.</u> § 3376(d)(2), prisoners on indeterminate SHU status receive periodic ICC reviews at least every 180 days for consideration for release to the general population.  <u>Id.</u> § 3341.5(c)(2)(A)(1).  Additionally, prisoners on indeterminate SHU status who have been validated as gang members can be reviewed for "inactive" gang status and release to the general population.  <u>Id.</u> § 3341.5(c)(5).

As relevant to the instant proceedings, defendant G. Stewart ("Stewart"), a Correctional Officer and former IGI Sergeant at PBSP, has summarized the inactive status review process at PBSP as follows:

a.    An inmate housed in a [SHU] as a gang member may be considered for review of inactive status when the inmate has not been identified as having been involved in gang activity for a minimum of six years.

b.    At Pelican Bay the inactive status review process usually begins when a Correctional Counselor prepares a case file for an inmate's annual classification review by the Pelican Bay [ICC], or for an inmate's 180-day classification review by the Pelican Bay Unit Classification Committee (UCC). The Correctional Counselor notes the date of the last known gang activity, or the date previously noted by one of the Classification Committees as the date that the inmate would next be eligible for an inactive status review.

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

c.      If the ICC or UCC determines that the inmate is eligible for an inactive status review, then the ICC or UCC refers the inmate to the Pelican Bay [IGI] Unit.

d.      The IGI places the inmate's name on its active/inactive review list.  The IGI then reviews inmates on the active/inactive review list in the chronological order that they were placed on the list.

e.      For the inactive status review the IGI conducts an investigation into whether the inmate had any documented gang activity in the last six years.  The IGI reviews the inmate's entire central file for any documentation of gang activity.  Additionally, the IGI may contact outside law enforcement or other sources to determine if an inmate has had any gang activity.  Generally the IGI also conducts a search of the inmate's cell for evidence of gang activity.  A documentation of gang activity is known as a "source item."  An initial gang validation requires three source items documenting gang activity.  An inactive review requires only one source item to continue an inmate's active gang status.

f.      During the inactive status review process, an [IGI] interviews the inmate and gives the inmate an opportunity to provide his or her opinion in writing about the source items used in the validation or inactive status review.  Inmates are given written notice at least 24 hours in advance of the interview.  All source items referenced in the validation or inactive status review are disclosed to the inmate at the time of notification.  The inmate is given copies of all non-confidential documents.  Confidential information used in the validation or inactive status review is disclosed to the inmate on a CDC Form 1030, Confidential Information Disclosure Form.  The interview is documented, including the inmate's opinion on the source items used in the validation.

g.      The documented interview is submitted with a validation package containing the source items documenting the inmate's gang activity to the Office of Correctional Safety (OCS, formerly the Law Enforcement Investigation Unit (LEIU)) in Sacramento for consideration.  The OCS/LEIU decides whether to approve or reject the inmate's inactive status or continued active status.

h.      The OCS/LEIU either validates or rejects each source item.  In an inactive review, if just once source item is validated then the OSC/LEIU will continue the inmate's active gang status.  The validation and/or rejection of evidence relied upon by the OCS/LEIU is documented on a CDC Form 128-B2, Gang Validation/Rejection Review, and returned to Pelican Bay.  At Pelican Bay the CDC Form 128-B2 is reviewed by the IGI and the Correctional Counselor, and the inmate is given a copy.

i.      At the inmate's next annual or 180-day Classification review either the ICC or the UCC retains the inmate in the SHU based on the new CDC Form 128-B2.  The ICC or UCC's action is noted on a CDC Form 128-G.

j.      If the inmate has been validated inactive by the OCS/LEIU, then the ICC refers the case to the Departmental Review Board ("DRB") in Sacramento to review the inmate's inactive status, housing status, and program status.  It is within the DRB's discretion to retain a validated inactive inmate in the Pelican Bay SHU.

3

United States District Court
For the Northern District of California

1  (Decl. G. Stewart Supp. Mot. Summ. J. ("Stewart Decl.") ¶ 2a-j.)

2  B.    Plaintiff's Placement and Retention on Indeterminate SHU Status

3        The facts pertaining to plaintiff's placement and retention in the PBSP SHU are as

4  follows:

5        In 1992, plaintiff was sentenced to life in state prison.  In 1994, he was validated as a

6  member of the Northern Structure ("NS") prison gang, and was sentenced to an

7  indeterminate term of confinement in the SHU.  (Compl. at 3:23-4:4.)

8         In February 2000 and September 2003, plaintiff's gang status was reviewed; on both

9  occasions he was found to still be an active NS gang member and was retained on

10  indeterminate SHU status.  (Compl. at 5:11-19 & Exs. B & S.)  In connection with the

11  September 2003 review, the IGI noted that plaintiff would next be eligible for an inactive

12  status review in May 2004.  (Compl. 5:18-19 & Ex. S.)

13        Plaintiff did not receive an inactive status review in May 2004.  In July 2004 he

14  received an annual ICC review, at which he was told he would be retained on indeterminate

15  SHU status based on his September 2003 validation as an active gang member.  (Compl. at

16  5:22-24 & Ex. W.)  He also was told he would receive his next inactive status review in

17  2007.  (Compl. at 5:24-25.)  In August 2004, the CSR in Sacramento endorsed the ICC's July

18  2004 recommendation to retain plaintiff on indeterminate SHU status.  (Compl. Ex. X.)

19        Plaintiff appealed the ICC's July 2004 recommendation on the ground that the

20  supporting documents from May 1998 validating plaintiff's continued active gang member

21  status were more than six years old and therefore should not have been relied upon by the

22  ICC.  Plaintiff's appeal was granted; on October 14, 2004 the ICC referred plaintiff to the IGI

23  for a review of plaintiff's current gang status.  (Compl. at 9:16-10:27 & Ex. C.)

24        On September 23, 2004, a settlement agreement was entered in the case of Castillo v.

25  Alameida, No. C 94-2847 MJJ-JCS (N.D. Cal. 2004), in which the parties thereto agreed to

26  changes in the California Department of Corrections and Rehabilitation's gang validation and

27  inactive review procedures.  (Defs. Req. Jud. Not. Supp. Mot. Summ. J., Settlement

28

4

Agreement ¶¶ 9-24.)[2]

On November 4, 2004, an investigation was initiated regarding plaintiff's gang status. In furtherance thereof, defendant Sgt. D. Higgerson ("Higgerson") issued plaintiff a CDC 1030 Confidential Disclosure Form referencing a confidential memorandum dated April 9, 2004, documenting that plaintiff's name had been found on an NS prison gang roster and that plaintiff was listed as a "soldado," i.e., a gang member. (Compl. 6:4-6 & Ex. D.) On November 9, 2004, Higgerson and defendant Stewart filed a Form CDC 128-B Inactive Gang Status Review stating that the IGI Unit had attempted to interview plaintiff but he had refused. (Ex. D.) Referencing the April 9, 2004 confidential memorandum, the Inactive Gang Status Review recommended that plaintiff's status as a validated member of the NS prison gang remain unchanged. (Id.)

On January 11, 2005, plaintiff appeared before the UCC for his 180-day review. The UCC continued plaintiff's indeterminate SHU status because the November 9, 2004 inactive review indicated plaintiff did not meet the inactive criteria. (Compl. 12:24-13:2 & Ex. Z-1.) The UCC informed plaintiff that his next inactive review would be "after April 2010." (Ex. Z-1.)

On January 25, 2005, plaintiff filed in this court a civil rights action claiming that he had been denied his May 2004 inactive gang status review and, consequently, that the ICC's July 2004 decision to retain him on indeterminate SHU status was unlawful. The action was dismissed on December 7, 2006, when the Court granted defendants' motion to dismiss due to plaintiff's failure to exhaust administrative remedies. See Garcia v. Kirkland, et al., No. 05-0341 MMC (PR) (Order, filed Dec. 7, 2006).

On June 15, 2005, plaintiff appeared before the ICC for his annual classification review. At the review the ICC: (1) reviewed plaintiff's November 2004 inactive status review and forwarded the matter to the IGI for a new review under the Castillo settlement

---

[2]CCR §§ 3341.5 and 3378, pertaining to gang validation and inactive review procedures, subsequently were amended pursuant to Castillo, and became operative on May 25, 2006.

United States District Court
For the Northern District of California

agreement, and (2) continued plaintiff's indeterminate SHU status based on his validation as an active member of the NS prison gang. (Compl. Ex. Z-2).

On July 14, 2005, the CSR endorsed the ICC's decision regarding the continuation of plaintiff's indeterminate SHU classification. (Compl. 13:22-23 & Ex. G.) On August 6, 2005, defendant Stewart, an IGI Sergeant, initiated an inactive status review of plaintiff pursuant to the <u>Castillo</u> settlement agreement. (Stewart Decl. ¶ 3.)

On September 1, 2005, Stewart provided plaintiff with a report of the results of Stewart's investigation into plaintiff's gang status. As an initial matter, the report noted that plaintiff met the criteria for inactive review status because all of the source items relied upon at his last gang validation in 2001 were now more than six years old. (Decl. L. Sciandra (Defs. Counsel) ("Sciandra Decl.") Supp. Mot. Summ. J. Ex. E.) Next, the report informed plaintiff that a review of his central file revealed the following three documents indicating gang activity in the previous six years:

> (1) a confidential memorandum, dated April 9, 2004, containing a roster of NS gang members, including plaintiff, listed by their aliases and directing members to "shout out" to other members by their aliases;

> (2) a CDC 128-B dated August 15, 2003, documenting plaintiff's calling out to validated prison gang members by their aliases, in accord with the April 9, 2004 confidential memorandum; and

> (3) a CDC 128-B dated August 13, 2003, also documenting plaintiff's calling out to validated prison gang members by their aliases, in accord with the April 9, 2004 confidential memorandum.

(<u>See</u> Stewart Decl. ¶ 3a; Sciandra Decl. Ex. E.)

The report further informed plaintiff that he would be interviewed by the IGI and, at that time, would have an opportunity to provide his opinion about the documents in the inactive status review package. (Sciandra Decl. Ex. E.) In preparation for the interview, plaintiff was given a CDC 1030 Confidential Disclosure Form documenting the April 9, 2004 confidential memorandum, and copies of the two non-confidential source items. (Stewart Decl. ¶ 3b; Sciandra Decl. Exs. B, C, D & E.)

On September 6, 2005, plaintiff was interviewed with respect to the inactive review source items identified by Stewart. At the interview he submitted a two-sided, single-page

United States District Court
For the Northern District of California

handwritten response for inclusion in the review package.  He confirmed that the response, which detailed his objections to the source items, included everything he wanted to convey to the LEIU and that he had no further questions or comments.  (Stewart Decl. ¶ 3d; Sciandra Decl. Exs. F1-5.)

Also on September 6, 2005, institutional gang investigators Stewart and Kays recommended that plaintiff be retained as an active member of the NS prison gang.  (<u>See</u> Stewart Decl. ¶ 3e; Sciandra Ex. F1.)  Subsequently, on September 30, 2005, Stewart prepared a gang information "chrono" detailing the documents found during plaintiff's inactive status review and noting that such documentation met the criteria for gang involvement under the California Code of Regulations; Stewart forwarded the documentation, together with plaintiff's response, to the LEIU to determine whether plaintiff should be revalidated as a gang member.  (Sciandra Ex. H.)

On October 27, 2005, the LEIU, including defendants Ruff and Fisher, revalidated plaintiff as an active member of the NS prison gang.  (Steward Decl. ¶ 3f; Sciandra Ex. G1-2.)

On November 22, 2005, plaintiff appeared before the UCC for his 180-day classification review.  The UCC continued plaintiff's indeterminate SHU status based on his October 2005 validation as an NS gang member.  (Sciandra Decl. Ex. N.)  Also on November 22, 2005, plaintiff appealed the inactive status review, claiming it was "biased and retaliatory."  (Compl. Ex. A at 1.)  The appeal ultimately was denied at the Director's level of review on April 17, 2006.  (Compl. Ex. A at 2-3, 6-7.)

Plaintiff filed the instant action on October 30, 2006.  He claims the decision by prison officials to continue his validation as an active gang member and retain him on indeterminate SHU status (1) deprived him of a protected liberty interest without adequate procedural protections, in violation of due process; (2) violated state regulations and the terms of the settlement agreement in <u>Castillo v. Alameida</u>; and (3) violated his First Amendment right to be free from retaliation.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

**DISCUSSION**

A.      <u>Legal Standard</u>

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." <u>See</u> Fed. R. Civ. P. 56(c).  Material facts are those that may affect the outcome of the case.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>See</u> <u>id.</u>

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>see also</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. at 248 (holding fact is material if it might affect outcome of suit under governing law; further holding dispute about material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  <u>See</u> <u>Celotex</u>, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if, as to any given fact, evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact.  <u>See</u> <u>Leslie v. Grupo ICA</u>, 198 F.3d 1152, 1158 (9th Cir. 1999).  The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting

1  evidence with respect to a disputed material fact.  See T.W. Elec. Serv. v. Pacific Elec.

2  Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

3  B.      Plaintiff's Claims

4          1.      Due Process Violation

5          Plaintiff claims prison officials failed to provide him with constitutionally adequate

6  due process before depriving him of a state-created liberty interest in being released from

7  indeterminate SHU status.

8          Interests protected by the Due Process Clause may arise from two sources – the Due

9  Process Clause itself and laws of the states.  See Meachum v. Fano, 427 U.S. 215, 223-27

10 (1976).  Where prison conditions are at issue, a change in conditions so severe as to affect the

11 sentence imposed in an unexpected manner implicates the Due Process Clause itself, whether

12 or not such change is authorized by state law.  See Sandin v. Conner, 515 U.S. 472, 484

13 (1995).  The hardship associated with administrative segregation, such as loss of recreational

14 and rehabilitative programs or confinement to one's cell for a lengthy period of time, is not

15 so severe as to violate the Due Process Clause itself.  See Toussaint v. McCarthy, ("Toussaint

16 I") 801 F.2d 1080, 1091-92 (9th Cir. 1986).

17         A deprivation authorized by state law that is less severe or more closely related to the

18 expected terms of confinement may also amount to deprivation of a protected liberty interest,

19 provided such deprivation "imposes atypical and significant hardship on the inmate in

20 relation to the ordinary incidents of prison life," Sandin, 515 U.S. at 484, or "will inevitably

21 affect the duration of [a] sentence," id. at 487.[3]  Once a protected interest is established,  the

22 court must determine what process is due before the interest may be taken away.  See

23 Wilkinson v. Austin, 545 U.S. 209, 224-25 (2005).

24 //

25

26         [3]Sandin abandoned the prior test of Hewitt v. Helms, 459 U.S. 460 (1983), which
   focused on whether the mandatory language of a regulation created a protected liberty
27 interest.  Sandin, 515 U.S. at 482-84; see Carver v. Lehman, No. 06-35176, slip op. 2491,
   2498 n.5 (noting Sandin analysis does not include consideration of whether regulation
28 contains mandatory language).

1

a.    Protected Liberty Interest

2      As an initial matter, plaintiff claims he is entitled to release from the SHU because a

3 protected liberty interest in such release has been created by various prison regulations

4 pertaining to the retention of inmates in administrative segregation and the SHU.  In

5 response, defendants point out that two of the three regulations cited by plaintiff do not apply

6 to inmates on indeterminate SHU terms.  In particular, CCR § 3339 describes the procedures

7 for retaining inmates in administrative segregation (not the SHU) after expiration of a

8 determinate term, and CCR § 3341.5(c)(3) provides that inmates "shall not be retained in

9 SHU beyond the expiration of a determinate term."  Here, however, it is undisputed that

10 plaintiff is confined in the SHU on an <u>indeterminate</u> SHU term with no expiration date.[4]

11 Accordingly, neither of the above two regulations is applicable herein.

12      The third regulation relied upon by plaintiff is CCR § 3341.5(c)(5), which sets forth

13 the inactive status review procedures for authorizing the release of gang-validated inmates

14 from an indeterminate SHU term.  Defendants argue the regulation does not create a

15 protected liberty interest because its provisions are not mandatory.  Specifically, defendants

16 argue, the regulation permits, but does not require, the review of the inactive status of an

17 inmate and permits, but does not require, the release from the SHU of an inmate determined

18 to be an inactive gang member.

19

20

21

22

_____

23      [4]Plaintiff claims the regulations apply to him because his entitlement to a periodic
review of his gang status every six years, discussed below, "makes an indeterminate term
24 'determinate.'"  (Opp. at 17:3-6.)  Plaintiff's argument fails because prison regulations
specifically define determinate and indeterminate SHU terms as distinct classifications.  <u>See</u>
25 CCR § 3341.5(c)(2).  Under such regulations, a determinate SHU term is for a fixed period
of time and is applied to inmates found guilty of serious disciplinary offenses.  <u>Id.</u> §
26 3341.5(c)(2)(B).  By contrast, "a validated prison gang member or associate is deemed to be
a severe threat to the safety of others or the security of the institution and <u>will be placed in a</u>
27 <u>SHU for an indeterminate term.</u>"  <u>Id.</u> § 3341.5(c)(2)(A)(2) (emphasis added).  The regulation
providing that gang members may be reviewed for inactive status after six years of no gang
28 activity specifically applies to gang members on <u>indeterminate</u> SHU status, and does not in
any way change that classification.  <u>See id.</u> § 3341.5(c)(5).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   The Court agrees that the language of the regulation is permissive;[5] this alone,

2   however, does not negate the existence of a protected liberty interest.  As noted, under

3   Sandin, for purposes of finding a liberty interest conferred by state law, the analysis focuses

4   on the nature of the deprivation rather than on the language of any particular regulation.

5   Here, plaintiff claims he has not been afforded due process with respect to his continued

6   retention on indeterminate SHU status.  The United States Supreme Court has held indefinite

7   confinement in Ohio's "supermax" facility, where inmates are not eligible for parole

8   consideration, imposes an "atypical and significant hardship within the correctional context."

9   Wilkinson, 545 U.S. at 224.  Consequently, because, in California, indefinite placement in

10  the SHU generally renders inmates ineligible for parole consideration, it would appear that

11  California prisoners have a liberty interest in their not being assigned to indeterminate SHU

12  placement without the procedural protections of due process.  See id. at 224-25.  While

13  plaintiff herein does not challenge his initial assignment to the SHU, the Court concludes,

14  under Sandin and Wilkinson, that prisoners also have a liberty interest in not being retained

15  indefinitely in the SHU without the procedural protections of due process.  Cf. Hewitt v.

16  _____

17      [5]The regulation provides:

18          As provided at section 3378(e), the Departmental Review Board (DRB)
    may authorize SHU release for prison gang members or associates categorized

19  as inactive.  The term inactive means that the inmate has not been involved in
    gang activity for a minimum of six (6) years.  Inmates categorized as inactive

20  who are suitable for SHU release shall be transferred to the general population of
    a Level IV facility for a period of observation that shall be no greater than

21  12 months.  Upon completion of the period of observation, the inmate shall be
    housed in a facility commensurate with his or her safety needs.  In the absence

22  of safety needs, the inmate shall be housed in a facility consistent with his or
    her classification score.  The DRB is authorized to retain an inactive gang

23  member or associate in a SHU based on the inmate's past or present level of
    influence in the gang, history of misconduct, history of criminal activity, or

24  other factors indicating that the inmate poses a threat to other inmates or
    institutional security.

25  (CCR § 3341.5(c)(5) (emphasis added).)

26      Additionally, CCR § 3378(e), cited in the above regulations, provides: "An inmate
    housed in a security housing unit (SHU) as a gang member or associate may be considered

27  for review of inactive status by the Department Review Board when the inmate has not been
    identified as having been involved in gang activity for a minimum of six (6) years."

28  (Emphasis added.)

United States District Court
For the Northern District of California

1  Helms, 459 U.S. 460, 477 n.9 (holding, pre-Sandin, that prisoners confined in administrative

2  segregation are entitled to periodic reviews); Toussaint I, 801 F.2d at 1101 (accord).  The

3  Court next considers whether plaintiff has been afforded the procedural protections to which

4  he is entitled.

5            b.      Procedural Protections

6                  (1).    The Castillo Settlement Agreement

7        Plaintiff claims his continued retention on indeterminate SHU status is unlawful

8  because the procedures used in 2005 to revalidate him as an active gang member did not

9  comply with the Castillo settlement agreement.  Such allegations do not state a claim for

10  relief under 42 U.S.C. § 1983, for the reason that a remedial court decree does not provide a

11  right secured by the Constitution or laws of the United States, the violation of which is a

12  necessary element of a § 1983 claim.  See West v. Atkins, 487 U.S. 42, 48 (1988).  In

13  particular, "such decrees are the means by which unconstitutional conditions are corrected

14  but [ ] they do not create or enlarge constitutional rights."  Green v. McKaskle, 788 F.2d

15  1116, 1123 (5th Cir. 1986); see DeGidio v. Pung, 920 F.2d 525, 534-35 (8th Cir. 1990)

16  (holding, in reliance on McKaskle, that consent decree requiring certain improvements in

17  conditions of confinement at state prison could not be enforced by way of § 1983 action).

18  Further, the Castillo settlement agreement itself provides that alleged noncompliance with the

19  agreement cannot be the basis for granting an individual inmate relief regarding his gang

20  validation.  (See Settlement Agreement ¶ 30c.)

21        Accordingly, the Court finds no cognizable claim for relief under § 1983, to the extent

22  such claim is based on plaintiff's allegations that prison officials did not comply with the

23  terms of the Castillo settlement agreement.

24                  (2).    Constitutional Requirements

25        Plaintiff further claims his continued retention on indeterminate SHU status is

26  unlawful because the procedures used in 2005 to revalidate him as an active gang member

27  did not meet constitutional due process requirements.

28        When prison officials determine whether to validate a prisoner as a gang member and

United States District Court
For the Northern District of California

place him on indeterminate SHU status, due process requires that he be provided with "some notice of the charges against him and the opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." Bruce v. Ylst, 351 F.3d 1283, 1287 (9th Cir. 2003) (internal quotation and citation omitted). Additionally, due process requires that prisoners confined to administrative segregation receive periodic reviews of their placement. Toussaint I, 801 F.2d 1101; see, e.g., Toussaint v. McCarthy, 926 F.2d 800, 803 (9th Cir. 1991) ("Toussaint II") (holding, with respect to decision to segregate, periodic review every 120 days satisfies due process).

As noted, plaintiff is not challenging his initial validation as a gang member, nor does he claim he was not provided periodic reviews of his placement during the relevant time period.[6]  Rather, he claims the inactive status review he received in September 2005 was constitutionally infirm because (1) it was untimely, and (2) the decision to revalidate him as an active gang member was not supported by sufficient evidence.

(A).    Untimely Review

Under CCR § 3341.5(c)(5), the Department Review Board may categorize as "inactive" an inmate "who has not been involved in gang activity for a minimum of six (6) years."  Similarly, CCR § 3378(e) provides that "[a]n inmate housed in a security housing unit (SHU) as a gang member or associate may be considered for review of inactive status by the Department Review Board when the inmate has not been identified as having been involved in gang activity for a minimum of six (6) years."  Based on the above regulations, plaintiff claims he should have been provided an inactive status review in May 2004, i.e., six years after his last-documented gang activity in 1998, but that such review was not initiated until August 2005, and was completed in September 2005.

As an initial matter, the Court notes that the regulations, contrary to plaintiff's argument, do not require an automatic inactive status review at the relevant six-year mark

---

[6] The undisputed evidence shows plaintiff was provided periodic and annual classification reviews, pursuant to CCR §§ 3341.5(c)(2)(A)(1) and 3376(d)(2), on January 13, 2004, July 7, 2004, January 11, 2005, June 15, 2005, and November 22, 2005.

**United States District Court**
For the Northern District of California

following an absence of gang activity.  Rather, as set forth above, the regulations provide that an inmate <u>may</u> be considered for inactive status review if he has not been involved in gang activity for <u>a minimum</u> of six years.  Thus, under the regulations, (1) the six-year mark is a minimum threshold for consideration for inactive review, and (2) such consideration is discretionary.

Further, even assuming, <u>arguendo</u>, the regulations do create a procedural right to an inactive status review at a point no later than the six-year mark, the failure to provide plaintiff with a timely review does not rise to the level of a constitutional violation. Specifically, the violation of procedural due process rights requires only procedural correction and not a reinstatement of the substantive right.  <u>See</u> <u>Raditch v. United States</u>, 929 F.2d 478, 481 (9th Cir. 1991).  Here, plaintiff received an inactive status review in 2005. Consequently, because, as discussed below, the 2005 review complied with due process, any procedural deprivation plaintiff might have suffered by virtue of the delayed 2004 inactive status review was corrected.

(B).   <u>Evidentiary Requirements</u>

Next, plaintiff claims he was denied due process because the decision to revalidate him as a gang member was not supported by sufficient evidence.  The decision to place an inmate on indeterminate SHU status based on gang affiliation must be supported by "some evidence."  <u>Bruce</u>, 351 F.3d at 1287.  Ascertaining whether the standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  <u>Id.</u>  Instead, "the relevant question is whether there is any evidence in the record that could support the conclusion reached."  <u>Id.</u> (quotation and citation omitted).  Further, "the evidence relied upon to confine an inmate to the SHU for gang affiliation must have 'some indicia of reliability' to satisfy due process requirements." <u>Madrid v. Gomez</u>, 889 F. Supp. 1146, 1273-74 (N.D. Cal. 1995); <u>see</u> <u>Bruce</u>, 351 F.3d at 1288 (finding, under "some evidence" standard, any one of three pieces of evidence would have sufficed to support plaintiff's validation as gang member because "each ha[d] sufficient indicia of reliability.")

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Here, as noted, the decision to revalidate plaintiff as an active gang member and to retain him in the SHU on an indeterminate basis was based on the following three "source items"[7]:

> (1) a confidential memorandum, dated April 9, 2004, containing a roster of NS gang members, including plaintiff, listed by their aliases and directing members to "shout out" to other members by their aliases;

> (2) a CDC 128-B dated August 15, 2003, documenting plaintiff's calling out to validated prison gang members by their aliases, in accord with the April 9, 2004 confidential memorandum; and

> (3) a CDC 128-B dated August 13, 2003, also documenting plaintiff's calling out to validated prison gang members by their aliases, in accord with the April 9, 2004 confidential memorandum.

(See Stewart Decl. ¶ 3e-f; Sciandra Ex. F-H.)

Plaintiff does not dispute the existence or reliability of the source items. Rather, he objects to the determination made by prison officials that such items establish plaintiff is an active gang member. Specifically, he claims that none of the source items show his "actual involvement" in gang activity, i.e., his commission of an unlawful act.

Contrary to plaintiff's argument, however, prison regulations do not require that an inmate actually be involved in unlawful gang activity in order to be validated as an active gang member. Under CCR § 3378(c)(1), "current gang activity" is defined as "any documented gang activity within the past six years." Under CCR § 3023, "gang activity" occurs when inmates "knowingly promote, further or assist any gang." Further, under CCR § 3341.5(c)(5), an "inactive" gang member is an inmate who "has not been involved in gang activity for a minimum of six (6) years." Thus, under the relevant regulations, an inmate who, in the past six years, has knowingly promoted, furthered or assisted a gang, may be deemed an active gang member.

Defendant Stewart, the IGI who conducted plaintiff's inactive review in August and September 2005, states the following with respect to the source items on which Stewart

---

[7]As discussed above, a "source item" is a documentation of gang activity. (Stewart Decl. ¶ 2e.) The source items prison officials may rely upon to determine a prisoner's gang involvement are listed at CCR § 3378(c)(8).

relied in finding plaintiff remains an active gang member:

> I have reviewed the confidential memorandum (CM) dated April 9, 2004, that was found in Inmate Garcia's central file and referenced in the CDC Form 1030 dated September 1, 2005. The CM documents a writing confiscated in a cell search of another validated NS gang member. Contained on one of the confiscated papers was a roster of NS gang members and associates with the instruction, "I just wanted to give you a roster of nombres [names] of soldados [soldiers] in D-2 so you know who to give a shout out to upon movements in and out of block."

> Inmate Garcia was identified on the note as "JB deStockton." The D2 housing unit officer noted that Garcia is addressed by other inmates as "JB."

> IGI has learned through interviews with inmates, inmates who have participated in the debriefing process, and confiscated material that prison gangs, specifically the NS prison gang, are required to account for movement in the building. It is also known to the IGI that those in bad standing with the prison gang are excluded from the roll call.

> In the two CDC 128-Bs dated August 15 and August 13, 2005, Inmate Garcia is documented conducting roll call, or giving shout outs, from the pod door to other inmates by their aliases. Included in the roll call were the following inmates: Ortega (alias "Gangster"), J-50993, a validated NS member; Pimentel (alias "Bird"), J-89643, a validated NS member; Caracheo (alias "Gabriel"), T-31022, a validated NS associate; Palomino (alias "Beto"), H-42132, a validated Nuestra Familia (NF) member; and Galvan (alias "Weasel"), K-24167, a validated NS associate. All of these inmates' names, along with their aliases, appeared in the writing documented in the CM dated April 9, 2004.

(Stewart Decl. ¶ 4a-c.)

Based on the above, the Court finds plaintiff has failed to create a triable issue with respect to the constitutional adequacy of the evidence relied upon to revalidate him as a gang member. Specifically, prison officials have demonstrated they relied upon "some evidence" with sufficient indicia of reliability to find plaintiff remained an active gang member.

In sum, plaintiff has not established the existence of a genuine issue for trial as to his claim that defendants violated his right to due process by revalidating him as a gang member in 2005 and retaining him on indeterminate SHU status. Accordingly, summary judgment will be granted in favor of defendants on this claim.

2.   Retaliation

Plaintiff claims that prison officials twice revalidated him as an active gang member in retaliation for his having filed a successful administrative appeal and initiating a federal civil

16

1    rights action.

2         Retaliation by a state actor for the exercise of a constitutional right is actionable under

3    42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been proper.

4    Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 283-84 (1977).  "Within the prison

5    context, a viable claim of First Amendment retaliation entails five basic elements:  (1) An

6    assertion that a state actor took some adverse action against a prisoner (2) because of (3) that

7    prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his

8    First Amendment rights, and (5) the action did not reasonably advance a legitimate

9    correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).  Retaliatory

10   motive may be shown by the timing of the alleged retaliatory act and inconsistency with

11   previous actions, as well as direct evidence.  See Bruce v. Ylst, 351 F.3d 1283, 1288-89 (9th

12   Cir. 2003).  The prisoner must prove all the elements of a viable retaliation claim, including

13   the absence of legitimate correctional goals for the conduct of which he complains.  Pratt v.

14   Rowland, 65 F.3d 802, 806 (9th Cir. 1995).

15        Retaliation claims brought by prisoners must be evaluated in light of concerns over

16   "excessive judicial involvement in day-to-day prison management, which 'often squander[s]

17   judicial resources with little offsetting benefit to anyone.'"  Id. at 807 (quoting Sandin v.

18   Conner, 515 U.S. 472, 482 (1995)).  In particular, courts should "'afford appropriate

19   deference and flexibility' to prison officials in the evaluation of proffered legitimate

20   penological reasons for conduct alleged to be retaliatory."  Id. (quoting Sandin, 515 U.S. at

21   482).

22        In support of his retaliation claim, plaintiff asserts defendants Higgerson and Stewart

23   went out of their way to find, and then mischaracterized, the evidence they relied upon in

24   their inactive status reviews, in November 2004 and September 2005, to recommend plaintiff

25   be continued as a validated gang member and retained on indeterminate SHU status.  In

26   particular, with respect to the three source items relied upon by prison officials to find

27   plaintiff was still an active gang member, plaintiff claims: (1) Stewart, unable to find

28   evidence of plaintiff's gang activity, went to another inmate's cell to find the roster of gang

United States District Court
For the Northern District of California

members that was identified in the April 9, 2004 confidential memorandum, (2) prison officials should not have relied on the roster because it was not written by plaintiff and does not provide a "real link" to gang activity, (3) only after plaintiff's filing of a successful administrative appeal and, subsequently, a federal civil rights action, did Stewart and Higgerson depict plaintiff's actions of calling out to other inmates on two separate occasions in 2003 as gang activity, and (4) Stewart and Higgerson took the two 2003 incidents out of context and mischaracterized the information with the purpose of denying plaintiff inactive status.

Plaintiff's retaliation claim fails for several reasons. As an initial matter, the evidence does not support plaintiff's assertion that, in response to plaintiff's successful administrative appeal, defendants went out of their way to find, and then mischaracterized, source items reflecting plaintiff's active gang status. In particular, no inference of retaliatory intent can be drawn based on the timing of defendants' actions, as shown by the following undisputed facts:

On August 13, 2003, a disciplinary chrono was placed in plaintiff's prison file because he called out to other inmates by their gang aliases. (Sciandra Decl. Ex. D.)

On August 15, 2003, another disciplinary chrono was placed in plaintiff's prison file for the same reason. (Id. Ex. C.)

In January 2004, plaintiff was informed that his gang status would next be reviewed in July 2004. (Compl. Ex. S.)

On April 9, 2004, plaintiff's name was found on a roster of gang members during the cell search of a validated NS gang member; the roster included instructions to NS gang members to "shout out" to other NS members by their aliases. (Sciandra Decl. Ex. B.)

In July 2004, plaintiff appeared before the ICC for his previously-scheduled annual ICC review. When the ICC determined plaintiff should be retained on indeterminate SHU status, plaintiff filed an administrative appeal. (Compl. Ex. W; Sciandra Decl. Ex. K.)

In October 2004, the appeal was granted because, as of 2004, the 1998 source items relied upon to validate plaintiff as an active gang member were more than six years old.

United States District Court
For the Northern District of California

1   Consequently, a special inactive status review of plaintiff was ordered, and the ICC referred

2   plaintiff to the IGI for evaluation of plaintiff's gang status.  (Compl. Ex. C.)

3         In response to the referral, the IGI initiated an investigation on November 3, 2004.

4   The investigation was conduced by defendant Higgerson.  Thereafter, in reliance on the three

5   source items noted above, the IGI recommended plaintiff's status as a validated member of

6   the NS prison gang remain unchanged.  (Compl. Ex. E; Sciandra Decl. Ex. K.)

7         In January 2005, plaintiff filed a federal civil rights action against PBSP prison

8   officials challenging the ICC's July 2004 decision to retain plaintiff on indeterminate SHU

9   status.  None of the defendants in that action are defendants to the instant action.  See Garcia

10  v. Kirkland, et al., No. C 05-0341 MMC (PR) (filed Jan. 25, 2005.)[8]

11        In June 2005, at plaintiff's annual ICC review, the ICC reviewed the November 2004

12  inactive status review and forwarded the matter to the IGI for a new review under the newly-

13  implemented Castillo settlement agreement.  (Sciandra Decl. Ex. M.)

14        In August 2005, Stewart initiated a new inactive status review and, in September

15  2005, the IGI recommended plaintiff be retained as an active member of the NS prison gang

16  based on the three noted source items.  Thereafter, the LEIU revalidated plaintiff as an active

17  NS gang member and the classification committee continued plaintiff's indeterminate SHU

18  status based on such validation.  (Sciandra Decl. Exs. E, G, H, J & K.)

19        The Courts finds, based on the above sequence of events, that plaintiff has failed to

20  create a triable issue with respect to whether defendants, in retaliation for plaintiff's

21  successful administrative appeal and/or his 2005 federal civil rights action, actively sought

22  out and then mischaracterized the nature of source items for the purpose of revalidating

23  plaintiff as an active gang member.

24        First, the undisputed evidence shows that all three of the source items used to validate

25  plaintiff predate the filing of plaintiff's administrative appeal in July 2004, the successful

26

27        [8]The action was dismissed on December 7, 2006, for failure to exhaust administrative

28  remedies.

United States District Court
For the Northern District of California

1   resolution of the appeal in October 2004, and the filing of plaintiff's civil rights action in

2   January 2005.

3          Moreover, there is no support for plaintiff's assertion that defendant Stewart's

4   retaliatory motive is evidenced by the fact that Stewart found the gang roster in another

5   inmate's cell.  In particular, plaintiff cites to no regulation providing that IGIs must rely only

6   on source items obtained directly from the gang-validated prisoner or from his cell.  Instead,

7   prison regulations expressly provide that IGIs may rely on "[a]ny material or documents

8   evidencing gang activity such as the membership or enemy lists, constitutions, organizational

9   structures, codes, training material, etc., of specific gangs."  CCR 3378(c)(8)(C).  Similarly,

10  with respect to plaintiff's contention that defendants mischaracterized the two 2003 incidents

11  of plaintiff calling out to other gang-affiliated prisoners as gang activity, prison regulations

12  provide that an independent source of gang activity may be based on "[d]ocumentation of

13  staff's visual or audible observations which reasonably indicate gang activity."  Id. §

14  3378(c)(8)(E).

15         Next, as additional evidence of retaliation, plaintiff notes that defendants did not

16  characterize the two 2003 incidents as source items indicating gang activity until his

17  November 2004 inactive status review.  Such timing, however, does not evidence retaliatory

18  intent, because, prior to November 2004, there was no need for defendants to review

19  plaintiff's active gang status, given that the 1998 source items relied upon to validate plaintiff

20  as a gang member were still considered up-to-date as they were not yet more than six years

21  old.  Thus, until defendants were ordered, in October 2004, to provide plaintiff with a new

22  inactive status review, there was no reason for defendants to consider the 2003 incidents and

23  their connection, if any, to the April 9, 2004 gang roster.

24         Further, contrary to plaintiff's assertion, the gang-related characterizations attributed

25  by defendants to the two 2003 incidents and the NS gang roster containing plaintiff's name

26  are not unreasonable, and, additionally, are supported by Stewart's description of prison gang

27  practices, in particular, the practices of the NS gang.  (Stewart Decl. ¶ 4.)  Plaintiff's

28  disagreement with defendants' assessment of the noted items does not create a triable issue

with respect to whether defendants' actions were retaliatory.

Finally, there is no merit to plaintiff's contention that defendants' actions were retaliatory because no legitimate correctional goal was served by defendants' investigating plaintiff's gang status, finding source items, and recommending that plaintiff be retained as an active gang member. In the Ninth Circuit, it is clear that prisons have a legitimate penological interest in stopping prison gang activity, see Bruce, 351 F.3d at 1289, and the prisoner bears the burden of proving and pleading the absence of a legitimate penological goal in his validation as a gang member, see id. The gang validation procedure, however, may not be used as a "cover up or ruse" to silence prisoners who assert their First Amendment rights. Id. Here, the undisputed evidence shows that defendants did not independently initiate investigation into plaintiff's inactive status simply because his administrative appeal was successful or because he filed a federal civil rights action. Instead, they were ordered to do so, first in November 2004, because plaintiff's administrative appeal had expressly requested an inactive status review, and thereafter in 2005, in conjunction with the implementation of the Castillo settlement agreement. Further, the undisputed evidence demonstrates defendants' recommendations that plaintiff be revalidated as an active gang member were reasonable and based on evidence that was gathered well before plaintiff ever filed his administrative appeal or civil rights action, and were in accordance with prison regulations.

In sum, the Court concludes plaintiff has failed to present evidence that raises a triable issue of fact as to whether the motive behind the inactive status review investigations and recommendations was retaliatory, and, consequently, defendants are entitled to summary judgment on plaintiff's retaliation claim.[9]

---

[9]In light of the Court's determination that defendants did not violate plaintiff's constitutional right to due process or his right to be free from retaliation, the Court does not reach defendants' argument that they are entitled to qualified immunity on plaintiff's claims. Saucier v. Katz, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.")

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

C.    Defendant Morsno

In its January 5, 2007 Order of Service, the Court directed the United States Marshal ("Marshal") to serve the three PBSP employees and three California Department of Corrections and Rehabilitation ("CDCR") employees named as defendants to this action. The Marshal successfully served all defendants except R.S. Morsno ("Morsno"), a member of the Law Enforcement Liaison Unit of the CDCR in Sacramento.

Specifically, on February 21, 2007, the unexecuted summons was returned to the court with a notation by the Marshal that the summons had been returned to the Marshal by the CDCR on February 20, 2007, for the reason that defendant Morsno could not be identified. (Docket No. 8.)  Additionally, attached to the unexecuted summons is a letter from Linda Young, a litigation coordinator with the Litigation Office of the CDCR, stating the Litigation Office was not authorized to accept service on behalf of defendant Morsno because "we are unable to identify this person."  (Docket No. 8, letter dated February 15, 2007.)  Upon filing the instant motion for summary judgment on July 3, 2007, Deputy Attorney General Lisa Sciandra, defendants' counsel, informed plaintiff and the Court that no appearance was being made by Sciandra on Morsno's behalf as Morsno had not been served.  (Mot. Summ. J. at 1 n.1.)  To date, Morsno has not been served.

In cases wherein the plaintiff proceeds in forma pauperis, the "officers of the court shall issue and serve all process."  28 U.S.C. § 1915(d).  The court must appoint the Marshal to effect service, see Fed. R. Civ. P. 4(c)(2), and the Marshal, upon order of the court, must serve the summons and the complaint, see Walker v. Sumner, 14 F.3d 1415, 1422 (9th Cir. 1994).  Although a plaintiff who is incarcerated and proceeding in forma pauperis may rely on service by the Marshal, such plaintiff "may not remain silent and do nothing to effectuate such service"; rather, "[a]t a minimum, a plaintiff should request service upon the appropriate defendant and attempt to remedy any apparent defects of which [he] has knowledge." Rochon v. Dawson, 828 F.2d 1107, 1110 (5th Cir. 1987).

Here, plaintiff was advised, at least as early as July 2007, that Morsno had not been served.  In the ensuing twenty months, however, plaintiff, has not attempted to remedy the

22

unsuccessful service by providing the Court with an address at which Morsno can be served.

Consequently, sufficient grounds exist for dismissal, without prejudice pursuant to Rule

4(m), of the claims against Morsno.  See Walker, 14 F.3d at 1422.

Moreover, although Morsno has not been served, it is clear the claims against him are

subject to dismissal for the reasons discussed above.  Specifically, the allegations against

Morsno are the same as those against the other CDCR defendants, and there is no suggestion

in the complaint and exhibits attached thereto, or in the briefs and exhibits filed in connection

with the instant motion for summary judgment, that the analysis of the claims against Morsno

differs in any respect from the analysis of the claims against the other CDCR defendants.

Given the Court's finding that, with respect to the claims against the served defendants,

plaintiff has failed to produce evidence showing prison officials violated his constitutional

right to due process or to be free from retaliation, plaintiff cannot prevail on those same

claims as against Morsno.  Accordingly, the Court will grant summary judgment in favor of

defendant Morsno.  See Abagninin v. AMVAC Chemical Corp., 545 F.3d 733, 742 (9th Cir.

2008) (holding district court properly granted motion for judgment on pleadings as to

unserved defendants where such defendants were in position similar to served defendants

against whom claim for relief could not be stated); Columbia Steel Fabricators, Inc. v.

Ahlstrom Recovery, 44 F.3d 800, 803 (9th Cir.1995) (affirming grant of summary judgment

in favor of nonappearing defendant where plaintiff, in response to summary judgment motion

filed by defendant who had appeared, had "full and fair opportunity to brief and present

evidence" on dispositive issue as to claim against nonappearing defendant).

D.    Plaintiff's Motions

Plaintiff has filed a motion to transfer this action to another venue, on the ground of

asserted delay by the Court in ruling on his claims.  Similarly, and for the same asserted

reasons, plaintiff has filed a motion for an immediate ruling on the instant motion for

summary judgment.  In light of the Court's ruling herein, plaintiff's motions will be denied as

moot.

United States District Court
For the Northern District of California

1

**CONCLUSION**

2      For the foregoing reasons, the Court orders as follows:

3      1.  Defendants' motion for summary judgment is hereby GRANTED, and judgment

4  shall be entered in favor of each of the defendants.

5      2.  Plaintiff's motions are hereby DENIED as moot.

6      This order terminates Docket Nos. 35 and 37.

7      The Clerk shall close the file.

8      IT IS SO ORDERED.

9  DATED: March 16, 2009

10                                         MAXINE M. CHESNEY
                                           United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California